**Robert Mickam TRUST, Plaintiff,**

v.

**UNITED STATES of America and United States Treasury Dept., Internal Revenue Service, Jointly and Severally, Defendants.**

No. 92–CV–74217–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 18, 1994.

Michael W. Davis, Alan M. Shapiro, Tax Div., U.S. Dept. of Justice, Washington, DC, for defendants.

Michael Finn, Farmington Hills, MI, for plaintiff.

*OPINION AND ORDER DISCHARGING DEFENDANT'S TAX LIEN FOLLOWING A TRIAL ON THE MERITS*

ZATKOFF, District Judge.

## I. INTRODUCTION

Plaintiff brought suit against defendants to have a tax lien on a piece of residential property ("the Turtle Creek property") discharged. This case originally was designated for this Court's August 1993 trailing docket. At the Final Pretrial Conference On July 14, 1993, plaintiff and defendants agreed to have this matter settled by cross-motions for summary judgment, in lieu of a trial.

However, after review by the Court, it was determined that genuine issues of material fact precluded the granting of summary judgment in favor of either party. The case thereafter proceeded to trial on July 19, 1994.

## II. BACKGROUND

On August 8, 1988, Ronald and Margaret Chandler ("the Chandlers"), not parties to the instant suit, were assessed with a Federal tax deficiency of $67,445.45, plus statutory interest. On February 3, 1989, pursuant to a divorce decree, Margaret Chandler quitclaimed[1] her interest in the Turtle Creek property to her husband Ronald Chandler ("Chandler").

On February 6, 1989, Chandler executed a warranty deed[2] for the Turtle Creek property to plaintiff, in exchange for $300,000. Plaintiff did not file the warranty deed with the Oakland County register of deeds; instead, plaintiff and Chandler agreed to place the warranty deed in escrow. The escrow agreement, also entered into on February 6, 1989, provides in pertinent part:

1. *PARTIES TO THE AGREEMENT*

The parties to this Agreement are:

Seller—Ron Chandler

Buyer—Robert Mickam Trust

Escrow Agent—Blue Water Title Company

. . . .

2. *INTENT OF AGREEMENT*

It is Seller's intent to sell the subject property to the Purchaser subject to an option to repurchase said property only upon the specific terms and conditions herein.

3. *POSSESSION OF SUBJECT PROPERTY*

It is understood that Seller shall during the term of this Escrow Agreement have the sole and exclusive right to continued possession of the subject property. Seller agrees to vacate the property upon the expiration of this Escrow Agreement unless Seller exercises his option to repurchase said property timely upon the strict terms and conditions of said option. Seller shall possess the property during the term of this Agreement with no obligation to pay Purchaser rental thereon. However, if Seller shall fail in his duty during the term of this Agreement to keep the premises fully insured (fire, theft, general liability, comprehensive) in an amount no less thaan [sic] $336,00 (and naming Purchaser as the insured party on said policy) or fail to promptly pay all property taxes on said property prior to (or no later than) thirty (30) days fromm [sic] due date, Seller shall be considered to be in material breach of this Agreement. If said breach continues beyond the 30 day period specified herein same shall result at Buyers Agents' option in forfeiture of Sellers' option to repurchase.

4. *TERM OF ESCROW AGREEMENT:*

The effective term of this Agreement may only be changed by Buyer and Seller, in writing.

---

**1.** *See* Quit Claim Deed, Joint Trial Exhibit 10.

**2.** *See* Warranty Deed, Joint Trial Exhibit 9.

5. *OPTION TO REPURCHASE:*

Purchaser hereby grants Seller a nonrenewable, nonextendable (unless an extension is mutually agreed to) option to repurchase property for up to 365 days subject to the following conditions:

A.   Maintenance of insurance and taxes as stated herein above.

B.   Payments to purchaser as follows:

1.   $18,000 to be paid no later than 182 days from the signing of this Agreement.

2.   $18,000 (for a total of $36,000 for this option) within 365 days from the signing of this Agreement.

The parties agree that time is of the essence in this Agreement. Seller acknowledges it is Purchaser's intent to take possession of the subject premises on the 366th day after signing of this Agreement in the event Seller fails to exercise this option to repurchase by strictly, completely and absolutely, including delivery to Purchaser of the sum of $300,000 in cash or certified funds on or before the 365th day after the signing of this Agreement.

6. *DUTIES OF ESCROW AGENT*

. . . .

D.   Immediately upon receipt of notice from Buyer, Seller's default or other material breach of this Agreement (i.e. nonpayment of monies agreed to be paid according to the terms of this Agreement) and demand for release of Deed, Escrow Agent shall tender said warranty deed to Purchaser in care of its attorney ... said delivery to be accomplished within 15 days grace time of any breach.

E.   At any time during this Agreement (but not thereafter) upon proof (including written confirmation by Purchaser) of payment by Seller to Purchaser of all monetary terms of this Agreement Escrow Agent shall tender said Warranty Deed and this Agreement to Seller.

Escrow Agreement, Joint Trial Exhibit 4.

Chandler and plaintiff also deposited with the escrow agent an "Affidavit Certifying to Interest in Real Property" ("Affidavit of In-

terest"). *See* Joint Trial Exhibit 7. Pursuant to Michigan Statutory Law,[3] the Affidavit of Interest was filed with the Oakland County Register of Deeds on February 15, 1989. The warranty deed was not filed at this time.

On March 16, 1989, a federal tax lien was filed against the Turtle Creek property for the Chandlers' individual income tax liabilities for the 1987 taxable year. In August 1989, Chandler failed to make the $18,000 payment necessary to exercise his option to repurchase the Turtle Creek property. The escrow agent failed to release the warranty deed to plaintiff. In a letter to the escrow agent, dated October 13, 1989, Chandler stated:

This release is regarding ... [the Turtle Creek property]. In connection with my agreement with the Robert Mickam Trust, dated February 6, 1989, being unable to fulfill my commitment under this agreement, I hereby assign and release my legal right and title to the aforementioned property. I thereby instruct you to release the deed of said property to Mauricio Mickam.

*See* Joint Trial Exhibit 8.

Subsequently, the escrow agent released the deed to the Mickam Trust. On October 13, 1989, the warranty deed was filed with the Oakland County Register of Deeds.

## III.   ANALYSIS

### A.   Applicable Law

The Federal Tax Lien Act, 26 U.S.C.A. § 6321, *et seq.* ("the Act"), provides that where a person neglects or refuses to pay a tax, after a demand has been made,

the amount ... shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, *belonging* to such person.

26 U.S.C.A. § 6321 (West 1989) (emphasis added). The Act also provides, however, that

[t]he lien imposed by section 6321 shall not be valid as against a purchaser ... until notice thereof which meets the require-

---

**3.**   *See* M.C.L.A. 565.451a(b) ("An affidavit stating facts relating to ... knowledge of the happening of any condition or event which may terminate

an estate or interest in real property" may be recorded in the office of the register of deeds of the county where the real property is located).

ments of subsection (f) has been filed by Secretary.

26 U.S.C. § 6323 (West Supp.1993).

Subsection (f) merely provides that, in this case, the tax lien be filed with the Oakland County Register of Deeds. Section 6323 defines a purchaser as

> ... a person who, for adequate and full consideration in money or money's worth, acquires an interest (other than a lien or security interest) in property which is valid under local law against subsequent purchasers without actual notice.

26 U.S.C. § 6323(h)(6) (West Supp.1993).

While federal law provides this Court with the rules for determining priority, state law governs the determination of the nature of the legal interest the taxpayer has in the property. *Aquilino v. United States,* 363 U.S. 509, 512–14, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365 (1960).

Plaintiff takes the position that it was a bona fide purchaser for value of the property on February 6, 1989. Consequently, because Chandler did not have any interest in the Turtle Creek property beyond an option to repurchase, from February 7, 1989, forward, the government's lien cannot attach to the Turtle Creek property.

The government acknowledges that state law governs the nature of the legal interest in the property. Further, the government takes the position that title did not pass to the plaintiff from Chandler, because there was no actual delivery of the deed or because the delivery was conditioned upon Chandler's failure to meet the conditions of the escrow agreement.

The government has clarified this Court's earlier characterization of the government's position. The Court had proceeded under the perception that the government asked the Court to declare the transaction an equitable mortgage, designed to secure a $300,-000 loan from the plaintiff Trust to Chandler. Rather, the government contends that, should the Court find that no delivery occurred, then title could not have passed at the closing, and Chandler would have retained an interest in the property beyond the February 6, 1989, closing; an interest to which the government lien could attach.

Under Michigan law, "[d]elivery of a deed is essential to pass title; its whole object is to indicate the grantor's intent to give effect to the instrument." *Noakes v. Noakes,* 290 Mich. 231, 239, 287 N.W. 445, 448 (1939); *Resh v. Fox,* 365 Mich. 288, 191, 112 N.W.2d 486 (1961). Moreover, "[t]he intent of the grantor to convey an interest is an essential element of an effective delivery." *Id.; Wilcox v. Wilcox,* 283 Mich. 313, 278 N.W. 79, 80 (1938).

The burden of proving that there has been a delivery of the deed is upon the party claiming an interest in the property. *Id.*

> The general rule is that a deed delivered to a third person to be by him delivered upon some happening of some event in the future which may or may not happen, does not pass title to the land until such event occurs, and then only from that time.

*Id.; Meade v. Robinson,* 234 Mich. 322, 208 N.W. 41 (1926). "Where a deed is delivered into escrow, the title vests in the grantee on performance of the conditions of escrow." *Francis v. Francis,* 143 Mich. 300, 106 N.W. 864 (1906); *Edward Rose Sales Co. v. Shafer,* 41 Mich.App. 105, 199 N.W.2d 655, 656 (1972) ("When something has been placed in escrow under an agreement that it is to go to a particular person upon the meeting of a condition, title vests in that person when the condition is met.").

Finally,

> Contracts for repurchase, made contemporaneously with conveyance of real estate, absolute in form, are sometimes strong evidence tending to show that the conveyances are intended to be mortgages; but where it appears that the parties really intended an absolute sale, and a contract allowing the vendor to repurchase, such intention must control, and to ascertain the intention of the parties the court will look beyond the writings to the circumstances surrounding the transaction.

*Reid v. Dowd,* 257 Mich. 492, 498, 241 N.W. 174 (1932) (*quoting Stahl v. Dehn,* 72 Mich. 645, 40 N.W. 922 (1888)).

This is the legal context of the instant case, under which the Court shall apply its factual findings.

## B. Factual Findings

In determining the nature of the interests involved in a real estate transaction, Courts must consider factors—in addition to the actual deed—such as

a bargain sale price, adverse financial circumstances on the part of the grantor, prior negotiations between grantor and grantee for a loan, and subsequent conduct of the parties concerning possession, taxes, and insurance to determine whether the conveyance actually creates a security interest.

John G. Cameron, Jr., Michigan Real Property Law 2d, § 18.6, at 659–60 (1993) (collecting Michigan cases).

The Court held a bench trial on July 17, 1994. During the trial, the Court had the opportunity to consider the witnesses' ability and opportunity to observe the facts and the events to which they testified; each witness's memory and manner while testifying; each witness's interest, bias or prejudice; and the reasonableness of each witness's testimony in light of all the evidence admitted.

■ Based upon the testimony produced during the trial and the briefs and exhibits that the parties submitted, the Court makes the following factual findings for the purposes of plaintiff's action to quiet title.[4]

### 1. Intent

#### a. The Documents

■ The documents actually prepared by the parties and executed at the closing indicate an intent to consummate a sale of the Turtle Creek property.

First, a warranty deed was executed on February 6, 1989, reflecting a conveyance by Chandler to the Mickam Trust. There has been no challenge to the authenticity of the deed. The deed does not purport to represent anything but an absolute sale.

The escrow agreement, excerpted in pertinent part, above, is the written instrument outlining the transaction, the intent of the parties, the rights and duties of each party, as well as the duties of the escrow agent. The agreement is signed by the parties, the escrow agent, and three witnesses. The critical clauses are initialed, as well.

The painstaking execution of this document belies any claim that it is a facade. The Court, therefore defers, to the express written intent of the document:

It is the Seller's [Chandler's] intent to sell the subject property to the Purchaser [Mickam Trust] subject to an option to repurchase said property only upon the specific terms and conditions herein.

Accordingly, proper execution of the document is strong evidence that the transaction in question was an absolute sale.

Following the closing, an affidavit, rather than the deed was filed with the register of deeds. The Affidavit of Interest, which refers to *plaintiff Mickam Trust as the seller* and *Chandler as the purchaser* (the opposite of how the warranty deed and escrow agreement refer to plaintiff and Chandler), provides in relevant part:

That on, to wit, the 6th day of February, 1989, a transaction was consummated between ... Purchaser [Chandler] and ... Seller [plaintiff], relating to the above described property, pursuant to which a document was executed between the parties.

That said Purchaser, pursuant to the terms and condition of said document will be entitled to receive title and conveyance of the subject property upon ... the fulfillment of certain conditions as enumerated in an escrow agreement on file with Blue Water Title Company.

. . . .

That the said Purchaser fully intends to carry out all of the terms and conditions of said document on the part of the Purchaser required to be performed and to receive

---

**4.** Pursuant to *United States v. Cooke,* 915 F.2d 250, 252 (6th Cir.1990), when the testimony of witnesses differ in material detail, this Court will indicate why it is crediting one witness' testimony over another witness' testimony.

conveyance of the Title to the said property.

Affidavit of Interest, Joint Trial Exhibit 7.

The Court finds that this document, naming the trust as *seller* indicates the parties' understanding that: (1) an absolute sale had occurred; (2) which transferred all title and interest at the closing; and (3) that meeting the criteria of the escrow agreement would *allow Chandler to buy* the house.

■ The government has argued that the Release signed by Chandler and sent to Blue Water Title, upon Chandler's default is evidence that Chandler retained an interest in the property until that time. *See* Joint Trial Exhibit 8. The Court disagrees.

It is standard in the industry for an escrow agent to seek a release from both parties to the escrow before releasing the title. Such a precaution is designed to protect the escrow agent from incurring liability due to an improper release of the title caused by mistake or fraud by one of the parties.

Mr. Klebba testified as such during the trial. He testified that this was the reason that he sought a release from Chandler despite the unilateral terms of the Escrow Agreement. *See* Joint Trial Exhibit 4, p. 3. It was also revealed during the trial that Blue Water Title was sued for its failure to timely release the deed. Under these circumstances, the Court finds that the Chandler Release does not signify the retention of an interest by Chandler.

The *absence* of other documents at the time of closing is also persuasive. There are no financial documents indicative of a mortgage or loan application. There are no documents indicating Chandler's credit history or credit-worthiness, or ability to repay. Finally, there was no promissory note signed by Chandler.

This lack of loan documents belies any contention that the sale was a disguised loan secured by the property.

5. Mickam did acknowledge that the other trustees, his mother and uncle, never did live there,

### b. The Parties

Mauricio Mickam, trustee for the plaintiff Trust, testified during the trial that he knew Chandler was in financial trouble, but was not concerned with his financial situation. His only indication of the extent of Chandler's debts came from the closing statement issued and utilized at the closing.

Mickam also testified that his intent was *only* to purchase the house. He stated that he had viewed the house with a realtor, and that the trust was looking for property to yield a present residence and future income.[5] He had also refused Chandler's request for a loan.

Mickam testified that he hoped that Chandler would not meet the terms of the repurchase option, so that the trust would have the property rather than the $36,000 capital gain. Mickam was emphatic that, at no time before, during, or after the transaction, did he intend to loan money to Chandler. He intended to purchase the property, and give an option to Chandler to repurchase, subject to the conditions in the escrow agreement.

Mr. Chandler's deposition is consistent. After describing, for the record, his understanding of the distinction between a mortgage and a sale, Chandler was asked, with regard to the Warranty Deed, Joint Trial Exhibit 9:

> Question: What does the deed do in your opinion or in your mind?
>
> Answer: ... The deed actually conveys my interest in the property.
>
> Question: Okay. To whom?
>
> Answer: To Robert Mickam Trust
>
> Question: And on what date?
>
> Answer: Sixth of February '89.

Chandler Dep., p. 51, Joint Trial Exhibit 11.

At the time of the deposition, Mr. Morgan, counsel for the government, objected to these questions, on the grounds that they called for a legal conclusion. However, the Court has used the testimony to infer Chandler's understanding and intent in entering into and completing the transaction, rather than for a legal conclusion. In fact, Mr. Finn, attorney

and that the property has been used as a rental property.

for the plaintiff prefaced the question with: "What does the deed do in your opinion or in your mind?" Chandler Dep., p. 51.

The government's objection is therefore overruled, as the Court finds the testimony admissible for, and insightful as to, the intent of Mr. Chandler.

Also at his deposition, Chandler was shown a copy of the Escrow Agreement. Chandler read paragraph number 2 of the agreement which states:

> It is the seller's [Chandler's] intent to sell the subject property subject to an option to repurchase said property only upon the specific terms and conditions herein.

Escrow Agreement, Joint Trial Exhibit 4. Chandler was then asked:

> Question: You have no quarrel with that concept?
>
> Answer: That's what it was.

Chandler Dep., p. 55, Joint Trial Exhibit 11.

The testimony of the parties, as well as the primary documents, are strong evidence that the intent of the parties was to enter into a sale, rather than a mortgage or loan, to consummate on February 6, 1989.

### c. The Title Company

The defense called to the stand Gerald Klebba, Vice President of Blue Water Title at the time of the 1989 transaction. Mr. Klebba testified that it was his understanding that the transaction which was to take place on February 6, 1989, was a mortgage. He also testified that he brought to the closing prepared documents, ready for execution of a mortgage.

Mr. Klebba also identified Joint Trial Exhibit 12, a Title Insurance Application Commitment. The document identifies Chandler as the owner, and the transaction in question as being a $300,000 mortgage. Mr. Klebba also identified the Title Insurance Policy contained in Exhibit 12, which is executed as a mortgage policy in favor of Mickam.

Mr. Klebba was emphatic that the transaction was to be a mortgage. The Court, however, notes Mr. Klebba's interest and potential for bias, as well as several discrepancies.

By his own admission, the mortgage documents were not executed on February 6, 1989. Mr. Klebba testified that, at the closing, counsel for the plaintiff "took over" and informed Klebba that the mortgage documents were not to be executed. Rather, the parties intended to, and did, execute the Escrow Agreement and other documents already admitted in this trial.

Next, Mr. Klebba indicated that he did not prepare the documents in question. Instead, Mr. Jerald R. Payton, former President of Blue Water Title, was in charge of the file and the preparation of documents, until closing.

Finally, on the stand, Mr. Klebba offered *from his own file* a document purporting to be a facsimile transmission to his office, dated February 3, 1989, and outlining the proposed terms of the escrow agreement. This document, transmitted three days before the closing, has a cover sheet indicating "TO: GTK [Gerald Klebba]" and "FROM: JR [Jerald R. Payton]" and constitutes constructive notice that the transaction was not to be the standard mortgage Mr. Klebba presumed it to be. *See* Plaintiff's Trial Exhibit 15.

Other documents prepared by the Title Company make references to a "Land Contract." These documents, however are printed forms filled out by the Title Company rather than by the parties. As such, the Court lends more weight to the documents prepared, executed and initialed by the parties.

### d. Prior Dealings

Mickam's and Chandler's testimony is consistent with regard to lack of any prior dealings. Mickam testified in court that he had not known Chandler before going to the Turtle Creek property with a realtor to view the property. He testified that Chandler had solicited a loan from him, but that Mickam had refused. He testified that he had no dealings with Chandler other than the transaction involving the property and a later sale of a guitar.

Chandler likewise testified at his deposition:

Question: Are you familiar with Marisio [sic] Mickam?

Answer: Yes.

Question: How do you know him?

Answer: I met him—I think he came to look at the house when it was for sale, if I'm not mistaken.

Question: Prior to that had you had any dealings with Mr. Mickam?

Answer: No.

Question: And outside of the transaction involving the Turtle Creek property, did you have any other dealings with Mr. Mickam?

Answer: Prior to that, no, I don't think I ever did. No, I know I didn't.

Question: None?

Answer: Prior to that, never.

While on the stand, as well as in his deposition, Mr. Mickam was asked numerous questions about negotiations for a loan from the trust to Chandler. While such discussions did occur, the Court finds that they were initiated by Chandler, and that Mickam, following discussions with the other trustees, refused to enter into such a transaction. In his deposition, and on the stand after references were made to the deposition, Mr. Mickam stated that his position was: "If you don't know how to be a bank, don't be a bank."

The Court finds that the lack of any prior dealings, the fact that the parties were strangers, and the fact that Mickam refused to enter into a loan agreement with Chandler are indicative of, and consistent with, the contention that an arms-length transaction occurred on February 6, 1989, resulting in the sale of the Turtle Creek property.

### e. Insurance and Taxes.

With regard to insurance, the terms of the Escrow Agreement are undisputed. According to the agreement, Chandler was to provide proof of insurance and property tax receipts for the Turtle Creek property. Escrow Agreement, p. 2, Joint Trial Exhibit 4. As noted herein, the agreement states:

[I]f Seller shall fail in his duty during the term of this Agreement to keep the premises fully insured (fire, theft, general liability, comprehensive) in an amount no less thaan [sic] $336,00 (and naming Purchaser as the insured party on said policy) or fail to promptly pay all property taxes on said property prior to (or no later than) thirty (30) days fromm [sic] due date, Seller shall be considered to be in material breach of this Agreement.

Escrow Agreement, p. 1, Joint Trial Exhibit 4.

Plaintiff's testimony that he was, in fact the beneficiary of the insurance policy, and that he, not Chandler, actually paid the insurance premiums and property taxes is not clearly contradicted.

Chandler's deposition answers regarding the subject were noncommittal, at best:

Question: Was the insurance still in your name?

Answer: I can't recall.

. . . . . .

Question: Did you provide proof of insurance to [the] escrow agent?

Answer: I can't recall but I would imagine I did.

The Court finds this evidence ambiguous. Terms by which Chandler was to pay insurance and taxes are indicative of his retention of an interest in the property. However, Chandler did not, in fact, make such payments, while Mickam did. Such actions are consistent with the contention that Mickam, rather than Chandler, had the protectible interest.

### f. Financial Position

At the time of the transaction, Chandler's financial situation was dire, at best. The Closing Statement, indicates that, from the $300,000 distributed at the closing, Chandler took only $33,979.70. *See* Joint Trial Exhibit 5. At the time, he also had the outstanding tax deficiency of some $68,000 which is the basis of this action, as well as other undisclosed debts.

In his deposition, Chandler stated:

Question: Do you recall that you might have been working somewhere or not working somewhere? I realize that it was a bad—

Answer: No, I was working on another project with another guy, but that inevitably didn't work out.

Question: So you didn't get any money from that?

Answer: I can't recall any income that I had at that time but I was certainly in a financial—under financial duress, if that's the right term.

Question: Is it fair to say you were broke?

Answer: I think, yeah, you could say I was pretty close, sure.

Question: Okay. You wouldn't have sold the house if you didn't need the money?

Answer: Well, it was under a court order at one point through my wife's attorney to sell the house, but that was prior to making the Mickam deal.

Chandler Dep., p. 66, Joint Trial Exhibit 11.

While financial duress can be an indication that some form of loan was anticipated, the Court is not persuaded as such in the instant case. Chandler was in financial trouble, such that he had previously been ordered to *sell* the house. That order did not ultimately result in this transaction, however, it is undisputed that Chandler did have his house listed with a realtor for sale for several months. It is also undisputed that Mickam's first contact with the house was via a realtor. The Court also readily recognizes that the $300,000 price is indicative of a distressed value sale of a property originally listed for $369,000 or $389,000.

Upon a thorough review of Chandler's deposition, as well as the testimony of the witnesses it is this Court's finding that Chandler's financial woes, following unsuccessful attempts to find a loan, led him to—albeit reluctantly—seek a *sale* of the house.

### 2. Delivery

The burden of proving that there has been a delivery of the deed is upon the party claiming an interest in the property. *Wilcox v. Wilcox*, 283 Mich. 313, 278 N.W. 79, 80. Plaintiff must, therefore, make a showing that delivery occurred.

Mauricio Mickam testified at trial that the deed was physically passed to him over the table, at which time he delivered the deed to the escrow agent. This testimony was uncontradicted. Mr. Klebba, the escrow agent, testified that all of the documents "were in a pile" and he had no knowledge of how the deed was passed. Mr. Klebba was only aware of where possession of the documents began, and where it ended.

Essentially, Mr. Klebba was concerned only that the escrow agent ultimately gained possession of the deed. He was not concerned with who actually passed him the deed.

Moreover, the Court gives weight to Mickam's testimony. A party who has tendered $300,000 is more likely to be acutely aware of the actual deed, than an escrow agent who has been caught by surprise by the nature of the proceedings.

### C. Discussion

■ The Court has thoroughly reviewed the issue of the intent of the parties in entering this transaction. The Court has scrutinized the trial exhibits and viewed the testimony, demeanor, and interest of the witnesses. Following such review, the Court has found that it was the intent of the parties to enter into an absolute sale. That does not end the analysis.

It is the government's contention in its trial brief, as well as its opening statement, that

> not only was the deed not delivered to the plaintiff, but receipt of the deed and thus vesting of title by plaintiff was contingent upon Chandler's 'default or other material breach of this [escrow] Agreement ...'

Government Trial Brief, p. 8.

This Court has made a finding that delivery of the deed by Chandler to plaintiff did, in fact, occur. At that time, title vested in purchaser, and Chandler no longer had an interest.

Moreover, notwithstanding such a finding, the Court disagrees with the government's contention that title vesting *in the trust* was contingent upon Chandler's default. Rather, the Court finds that an absolute sale had occurred, and an option to repurchase executed. Therefore, instead of Chandler's de-

fault causing title to vest in the trust, the agreement was executed and intended to *reconvey title to Chandler,* upon meeting of each of the conditions of the escrow agreement. Thus, title had *already* vested in the trust, and the contingency involved was that title would only vest in *Chandler,* upon meeting of each of the criteria.

The government has argued that delivery to Mickam was not complete, because the title was delivered into escrow. It is long settled that "[w]here a deed is delivered into escrow, the title vests in the grantee on performance of the conditions of escrow." *Francis v. Francis,* 143 Mich. 300, 106 N.W. 864 (1906).

This Court's findings are in accordance with this standard. The Court has found that the title was delivered across the table to Mickam, *then* transferred into escrow. When Mickam delivered the deed into escrow, he made the transfer of title *back to Chandler* contingent upon the conditions of the escrow agreement. The Court finds that it was not the original transfer to Mickam which was conditional, but rather the repurchase option. For this reason, the government's argument must fail.

The Federal Tax Lien Act which provides for a tax lien in favor of the United States upon real property, also provides that

[t]he lien imposed by section 6321 shall not be valid as against a purchaser ... until notice thereof which meets the requirements of subsection (f) has been filed by Secretary.

26 U.S.C. § 6323 (West Supp.1993).

The Court's findings in the instant case are: (1) that it was the parties intent to enter into an absolute sale; (2) that actual delivery of the deed to Mickam occurred; and (3) that the deed was placed into escrow for purposes of the transfer of title for the potential repurchase. Together, these preclude the finding that the tax lien is superior to the interest of the Mickam trust.

Because an absolute sale of the property occurred, and because the Mickam trust was a bona fide purchaser for value, without notice, Chandler had no interest in the Turtle Creek property beyond February 6, 1989, to which the government lien could attach. The government lien, filed on March 16, 1989, must therefore be discharged.

## IV. CONCLUSION

Following a bench trial to resolve the issues of fact presented, this Court finds for plaintiff. For the reasons stated herein, the government tax lien, filed pursuant to 26 U.S.C.A. § 6321, *et seq.,* is HEREBY DISCHARGED.

IT IS SO ORDERED.